J-A29026-25
J-A29027-25
J-A29028-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.J.B., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 898 WDA 2025 |

Appeal from the Decree Entered June 23, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000115-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 878 WDA 2025 |

Appeal from the Decree Entered June 23, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000115-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 879 WDA 2025 |

J-A29026-25
J-A29027-25
J-A29028-25

Appeal from the Decree Entered June 23, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000116-2023

IN THE INTEREST OF: K.D.B., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: B.B., FATHER :
:
:
:
:
: No. 811 WDA 2025

Appeal from the Decree Entered June 23, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-00116-2023

BEFORE: OLSON, J., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.: **FILED: JANUARY 23, 2026**

Appellants, M.S. ("Mother"), T.J.B., Jr. ("Father Blow"), and B.B. ("Father Ball"), appeal from decrees entered on June 23, 2025, involuntarily terminating their parental rights pursuant to 23 Pa.C.S.A. § 2511(a) and (b) of the Adoption Act.[1] After careful consideration, we affirm and adopt the trial court's opinion.

---

[1] There are two children at issue herein, M.B. (a female born January 2020) and K.D.B. (a male born June 2021). Mother appeals the involuntary termination of her parental rights to M.B. at Superior Court docket 878 WDA 2025 and she challenges the involuntary termination of her parental rights to K.D.B. at Superior Court docket 879 WDA 2025. The children have different fathers who share the same surname initial. For this reason, the trial court differentiated them as "Father Blow" and "Father Ball" and for continuity we will continue to do so. Father Blow is M.B.'s biological father and he challenges the termination of his parental rights to M.B. at docket 898 WDA 2025. Father

*(Footnote Continued Next Page)*

- 2 -

We briefly summarize the facts and procedural history of this case as follows. In January 2020, Mother gave birth to M.B. Soon thereafter, the Allegheny County Office of Children Youth and Families ("OCYF") received a report that Mother and M.B. were living in a residence where a shooting occurred. OCYF further investigated reports that Mother was abusing narcotics, had been the victim of domestic abuse, and that she missed several medical appointments for M.B. On April 15, 2020, OCYF removed M.B. from Mother's care and the infant was later adjudicated dependent on May 21, 2020. On February 23, 2021, M.B. was returned to Mother's care.

In June 2021, Mother gave birth to K.D.B. and both children were permitted to remain in the care of Mother and Father Ball. On August 13, 2021, the trial court closed M.B.'s dependency case. In September 2021, however, criminal charges were lodged against Mother and Father Ball for suspected child abuse regarding R.B., another child that resided with Father

_____

Ball is K.D.B.'s biological father and he challenges the termination of his parental rights to K.D.B. at docket 811 WDA 2025. Additionally, Mother and Father Ball have another child together, N.B., who was born in October 2023, and was in their care during relevant periods, but is not the subject of these appeals. We note that the trial court issued a single opinion in these matters. Accordingly, this Court has consolidated these appeals *sua sponte*. *See* Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal."). Finally, while the parties purport to appeal from "orders" entered by the trial court, a trial court actually enters the termination of parental rights by "decree." *See* 23 Pa.C.S.A. § 2521 (Effect of decree termination). As such, we have changed the captions accordingly.

Ball as a result of a prior relationship. OCYF also received complaints that police had been called to the residence on several occasions for domestic disputes. On September 10, 2021, OCYF applied for, and was granted, emergency protective custody and authorization to remove the children and place them with their maternal grandmother (Maternal Grandmother), where they have resided since. The trial court ordered Mother to attend and complete mental health evaluations, intimate partner violence counseling, drug and alcohol treatment, random narcotic testing, and parenting classes and to engage in regular visitation with the children, as well as secure stable housing.

At the time of M.B.'s removal, Father Blow was identified as the biological father; however, he was incarcerated on domestic violence charges against Mother. He was released from prison in April 2020 shortly after M.B.'s removal. Following M.B.'s dependency, the trial court ordered Father Blow to complete a mental health examination, participate in parenting programs and intimate partner violence counseling, maintain contact with OCYS, visit M.B., and comply with a home assessment. Mother and Father Blow ended their relationship shortly thereafter and Mother began dating Father Ball. Ultimately, Father Blow was incarcerated again in February of 2022 and did not complete any of his court-ordered reunification goals.

K.D.B. was born to Mother and Father Ball in June 2021. In August 2021, Father Ball's son, R.B., from a previous relationship was placed in the care of Mother and Father Ball. In September 2021, as mentioned above,

- 4 -

criminal charges were filed against Mother and Father Ball for suspected child abuse of R.B. OCYF also received complaints that police were called to the residence on several occasions for domestic disputes and that Father Ball overdosed on narcotics in August 2021. Father Ball was ordered to complete a drug and alcohol evaluation and partake in subsequent treatment, to submit to random drug testing, attend parenting classes, to participate in intimate partner violence counseling to specifically address pending criminal charges against him, and maintain stable housing.

In June 2024, following reports that N.B. almost drowned while in Mother's and Father Ball's care, Mother and Father Ball were incarcerated in November 2024.

On May 10, 2023, OCYF filed separate petitions to involuntarily terminate the parental rights of Mother, Father Ball, and Father Blow to M.B. and K.D.B. In September 2023, February 2025, and March 2025, Dr. Beth Bliss conducted individual and family interactional evaluations with Mother, Father Ball, Father Blow, M.B., K.D.B., and Maternal Grandmother. Furthermore, the trial court held permanency review hearings on October 27, 2022, February 16, 2023, June 27, 2023, October 5, 2023, April 18, 2024, and July 25, 2024. The trial court held termination hearings on April 7, 2025 and June 6, 2025. Mother, Father Ball, and Father Blow were incarcerated at the time of the proceedings but were permitted to testify remotely. On June 23, 2025, the trial court entered decrees involuntarily terminating the parental rights of Mother, Father Ball, and Father Blow. These timely appeals resulted.

Our standard of review is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.

Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-830 (Pa. Super. 2022) (citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant

- 6 -

termination. ***Id.*** at 830; ***see also*** 23 Pa.C.S.A. § 2511(a)(1)-(11).  If the trial court determines the petitioner has established grounds for termination under one of these subsections by clear and convincing evidence, the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013); ***see also*** 23 Pa.C.S.A. § 2511(b).

The trial court terminated Mother's and Father Ball's parental rights to M.B. pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (b).  The trial court terminated Mother's and Father Blow's parental rights to K.D.B. pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (b).   The applicable statutory provisions provide, as follows:

> **(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> >
> > \* \* \*
> >
> > (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist,

the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

This Court has previously determined:

The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated.

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and

- 8 -

support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his ... ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. **Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.**

Additionally,

[t]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

There also is a recognized connection between Pennsylvania law on termination of parental rights and the Adoption and Safe Families Act ("ASFA"), the stated policy of which is:

[T]o remove children from foster placement limbo where they know neither a committed parent nor can [they] look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family.... States such as Pennsylvania, which participate in the program, are

required to return the child to its home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in the Adoption and Safe Families Act of 1997. Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

In the case of an incarcerated parent, this Court has held:

the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his ... child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his ... children.

Where a non-custodial parent is facing termination of his ... parental rights, the court must consider the noncustodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the noncustodial parent and his ... child. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

Thus, a parent's basic constitutional right to the custody and rearing of his ... child is converted, upon the failure to fulfill his ... parental duties, to the child's right to have proper parenting and fulfillment of his ... potential in a permanent,

healthy, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated.

Thus, the fact of incarceration alone neither compels nor precludes termination of parental rights. Parents must still provide for the emotional and physical well-being of their children.

*In re Z.P.*, 994 A.2d 1108, 1118–1120 (Pa Super. 2010) (emphasis, ellipses, and brackets in original; internal citations omitted).

On appeal, each party presents two nearly identical issues for our review. First, Mother, Father Ball, and Father Blow all argue that the trial court abused its discretion or erred as a matter of law by involuntarily terminating their parental rights under Section 2511(a), where there was no clear and convincing evidence that the parties failed to perform parental duties or that the conditions that led to the children's removal could not be remedied within a reasonable time.[2] *See* Mother's Brief at 8; *see also* Father Ball's

---

[2] More specifically, Mother argues that she completed intimate partner violence counseling, various parenting and substance abuse programs, and had consistent access and regular visitation with the children because they resided with her mother, Maternal Grandmother. Mother's Brief at 10-14; 24-28. As such, Mother maintains there was insufficient evidence to prove that she could not provide essential parental care under Section 2511(a). *Id.* at 28. Father Blow asserts that "incarceration alone is insufficient to demonstrate a settled purpose to relinquish parental rights[,]" he was "offer[ed] minimal opportunities to maintain a relationship from prison" but "he participated in therapeutic, parenting, and reentry programs while incarcerated, preparing himself to assume parental duties upon release" and that "[w]hile M.B. has been in placement for an extended period[,]" there was no evidence "that Father is unable or unwilling to remedy the circumstances" pursuant to Section 2511(a). Father Blow's Brief, at 8-11. Father Ball argues he "was close to completing all of his [court-ordered] goals" and that he participated in drug treatment, intimate partner violence counseling, and parenting classes, both before and after he was incarcerated on charges of

*(Footnote Continued Next Page)*

Brief at 6; *see also* Father Blow's Brief at 6. Second, the parties argue that the trial court abused its discretion or erred as a matter of law by concluding that termination of parental rights would best serve the developmental, physical and emotional needs of M.B. and K.D.B. under Section 2511(b) and that severing the children's bonds with their biological parents would not cause them emotional distress.[3] *Id.*

Based upon our review of the certified record, applicable law, and the trial court's well-reasoned decision, we affirm the termination decrees and

---

endangering the welfare of N.B. Father Ball's Brief at 10-12, 15 and 19. As such, Father Ball concludes that "[t]he evidence clearly shows that Father [Ball] worked with all required services and completed many of said services" and, therefore, "[t]here was insufficient evidence to prove that [he] could not provide essential care to K.[D.]B." under Section 2511(a). *Id.* at 20.

[3] In greater detail, Mother contends that the record demonstrates that the children had a secure attachment to her, the relationships were beneficial, and completely severing Mother's bond could impact the children and that, instead, "Dr. Bliss explained that it was her opinion that the children should maintain a guaranteed relationship with [] Mother and subsidized permanent legal custodianship would be more appropriate" than termination pursuant to Section 2511(b). Mother's Brief, at 16-17 and 31. While acknowledging his incarceration, Father Blow argues that "[t]he record contains no bonding assessment and no substantive testimony regarding the nature of the relationship between Father [Blow] and M.B." as there were no observations of interaction between them and, therefore, there was no evidence severance of the parental bond would not cause harm as required under Section 2511(b). Father Blow's Brief, at 14-15. Father Ball maintains that he "loves K.[D.]B. and has much to offer for his benefit[,]" that the relationship between them "adds value to their lives[,]" and, therefore, termination "is not best for his needs and welfare" pursuant to Section 2511(b). Father Ball's Brief at 22.

- 12 -

adopt the trial court's opinion filed on August 7, 2025.[4]   As the trial court recognized, these cases had been active for almost five years before termination petitions were filed.  The trial court noted that it conducted multiple review hearings and the expectations and court-ordered reunification goals for all three parents were clearly expressed.  The termination hearings were conducted over the course of two days wherein 15 witnesses testified, including various caseworkers and service providers, as well as Maternal Grandmother, Mother, Father Ball, and Father Blow.

With regard to Section 2511(a), the trial court noted, *inter alia*, that while Mother and Father Ball had periods of success and participated in some provided services initially, they both continually relapsed by abusing narcotics and engaging in domestic violence and criminal conduct which finally led both to incarceration.  Further, the trial court cited safety concerns with Father Ball because two of his other children (not at issue instantly) were injured while in his care.  Neither Mother nor Father Ball have addressed mental health treatment.  Moreover, the trial court recognized that although Father Blow has been incarcerated for most of M.B.'s life, he contacted OCYF only twice, has never contacted M.B. or Maternal Grandmother, has not seen M.B. since she

_____

[4]   We note that the trial court opinion is not paginated nor dated or time-stamped.  Upon review of the supplemental certified record, the trial court docket indicates that the trial court filed its opinion pursuant to Pa.R.A.P. 1925(a) on August 7, 2025.  For ease of discussion and citation to the record on appeal, we caution the trial court to paginate, date, and time-stamp future decisions.

was an infant, and only requested visitation in November 2023, well after the termination petition had been filed.

As to Section 2511(b), the trial court stated that although there was testimony that the bond between Mother and M.B. and K.D.B. was beneficial, it was not necessary and that although the children might initially be sad or troubled by termination, it would not have a traumatic impact on them. Moreover, the trial court found that the stability and support given by Maternal Grandmother offset any emotional impact of termination, especially for K.D.B. who had only been in Mother's care for a few months. Evidence was presented that the children are strongly bonded with Maternal Grandmother and view her as their parent even when Mother is present, and that Maternal Grandmother has provided a safe, stable and loving home. Finally, the trial court noted that Mother was a potential safety risk because of her substance abuse and alleged child abuse in a separate matter, and, therefore, reunification was not in the children's best interest.

With regard to Father Blow, the trial court found that he has been incarcerated for much of M.B.'s life and has been continuously incarcerated since February 2022. The trial court also noted that Father Blow has not had contact with M.B. since 2020 and she does not even know that he is her father. Thus, the trial court concluded that there was no bond between Father Blow and M.B.

With regard to Father Ball, the trial court found that the bond between him and K.D.B. was not necessary or beneficial and that K.D.B. would not

suffer emotional distress if severed. The trial court noted that K.D.B. was only a few months old when he was removed from Father Ball's care, Father Ball attended 28 of 63 offered visits with K.D.B. and only saw him five times since 2023. The trial court additionally considered the best interests of K.D.B., citing safety concerns as two other children sustained unexplained injuries in Father Ball's care and he was convicted of endangering the welfare of a child.

Here, our review of the record demonstrates that there is sufficient, competent evidence to support the trial court's factual and legal determinations. Thus, we will not disturb the trial court's decision. Accordingly, we affirm the trial court's decrees entered on June 23, 2025, terminating Mother's, Father Ball's, and Father Blow's parental rights to their respective children pursuant to 23 Pa.C.S.A. § 2511(a) and (b) of the Adoption Act, on the basis of the well-reasoned and thorough analysis of the trial court opinion filed on August 7, 2025. The parties are directed to attach a copy of the August 7, 2025 decision to any future filings with this Court or any other court addressing this ruling.

Decrees affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 1/23/2026

- 15 -